**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

| | | |
|---|---|---|
| CHRISTOPHER PYATT and JAMILA PYATT, | ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | No. 2:23-cv-05772-DCN |
| INTERNATIONAL LONGSHOREMEN'S ASSOCIATION LOCAL 1422, OTIS WHALEY, and INTERNATIONAL LONGSHOREMEN ASSOCIATION, | ) ) ) ) ) | **ORDER** |
| Defendants. | ) ) | |

This matter is before the court on defendant International Longshoremen's

Association's (the "ILA") motion for summary judgment, ECF No. 94. For the reasons

set forth below, the court denies the motion.

## I.  BACKGROUND

The ILA is an international labor union, headquartered in New Jersey, that

represents longshore workers in various regions throughout the United States, the

Bahamas, and parts of Canada. ECF No. 94-2, Daggett Aff. ¶ 2. There are more than

200 local unions affiliated with the ILA. Id. ¶ 3. These local unions enter into

agreements to supply labor for waterfront employers in the area where they operate. See

ECF No. 103-4, ILA const. art. XXIII (describing local unions' authority to enter into

collective bargaining agreements). In general, each of these local unions are self-

governing, have their own bylaws, elect their own leadership, and maintain their own

1

offices.[1]  Daggett Aff. ¶ 3.  The International Longshoremen's Association Local 1422 ("Local 1422") is the local union specifically responsible for entering into agreements with and supplying labor for employers in the Port of Charleston.  ECF No. 103-3, Riley Depo. at 9:22–10:1.

This case is about an accident involving plaintiff Christopher Pyatt ("Mr. Pyatt"), a longshore worker who alleges he was struck by a truck and injured while crossing the street to report to Local 1422's hiring hall.  See generally ECF No. 1-1, Amend. Compl. In this order, the court focuses on the question of whether Mr. Pyatt and his wife, plaintiff Jamila Pyatt ("Mrs. Pyatt") (together with Mr. Pyatt, the "Pyatts"), can hold the ILA liable for the allegedly tortious conduct that led to the accident.  Answering this question will depend largely on the relationship between the ILA and Local 1422.  Thus, the court will begin by providing background on the operations at Local 1422's hiring hall and the facts that led to the ILA imposing a trusteeship over Local 1422.  The court will then recite the Pyatts' allegations regarding the accident and the procedural history leading to this point.

### A.  Local 1422's Hiring Process and Space Restrictions

At the time of the accident giving rise to this case, Local 1422 supplied labor to waterfront employers by hosting hirings each day at its hiring hall on Morrison Drive. Riley Depo. at 29:16–30:2.  In essence, these hirings are how Local 1422 distributes jobs among the workers, and it is worth pausing here to briefly examine how they work.  Each evening, waterfront employers send Local 1422 orders for labor based on the following

---

[1] The local unions' discretion is not unfettered.  For example, a local union's bylaws cannot conflict with the ILA constitution and must be approved by the ILA president before they become effective.  ECF No. 103-4, ILA const. art. XII, § 5.

day's expected workload and volume.  Id.  Local 1422 would then blast text messages out to a couple thousand eligible workers about what jobs were going to be available for that day.[2]  Riley Depo. at 29:16–30:2, 35:23–36:25.

After receiving a text message, workers wishing to receive a job were required to physically report to Local 1422's hiring hall for that day's hirings.  Id. at 37:6–9, 50:17–21.  Local 1422 typically holds hirings in the morning, often around 6:00 a.m., but may hold multiple hirings throughout the day or night depending on the day's volume.  Id. at 29:16–30:2.  During the hirings, workers group themselves according to seniority, and Local 1422 distributes jobs according to seniority and certification.  Id. at 43:5–44:2.

There are normally more workers than there are available jobs, and workers who do not receive a job must go home and show up for the next hiring period.  Id. at 45:24–46:3.  If selected, the workers usually have around an hour to reach their job site, and some workers may prefer to reach their job sites early so that they have their choice on what equipment they are using, which is distributed on a first-come, first-served basis.  Id. at 38:5–41:14, 186:1–18.  Consequently, the hiring hall can be a busy place during the hiring process, with hundreds of workers coming and going to receive jobs and depart to reach their job sites on time.  Id. at 45:5–15.

Beyond that, in recent years, labor needs for employers in the Port of Charleston have increased as volume through the port has grown.  Id. at 55:18–22.  During heavy hiring periods, more workers would show up at the hiring hall than there were available

---

[2] The workers who received these text messages were not necessarily all members of Local 1422.  Riley Depo. at 31:2–37:5.  However, to receive these messages and be eligible for work, a worker must apply and go through an interview process with Local 1422.  Id. at 31:6–33:12.

parking spaces, and this problem became worse as the Port of Charleston grew.  Id. at 52:6–62:25.  During heavy hiring days, the hiring hall would fill up and workers would often have to park offsite.  Id. at 58:6–62:25.

Eventually, Local 1422 began looking for a new location to deal with its space availability issues.  Id. at 63:1–14, 67:20–68:10.  The leadership of Local 1422 began looking for a new space, but when put to a vote, Local 1422's membership voted against selling the Morrison Drive location and relocating.  Id. at 75:16–76:19.

### B.  The ILA Imposes a Trusteeship over Local 1422

On May 24, 2019, Local 1422's president, Kenneth Riley ("Riley"), wrote a letter to ILA's president, Harold Daggett ("Daggett").  ECF No. 103-6.  In this letter, Riley explained that, due to significant growth at the Port of Charleston, Local 1422 was having trouble meeting its contractual obligations to employers in the port area.  Id. at 1.  Riley explained that the issue was not finding workers, as there were 2,400 applicants with employment credentials, but the issue was that Local 1422 did not have the floor space or parking to accommodate the additional workers.  Id. at 2.  He expressed his frustration that the leadership of Local 1422 was seeking to find a larger facility to accommodate these new workers but that Local 1422's membership had "blocked every effort to secure a larger facility with adequate parking."  Id. at 3.  He went on to explain:

> In my opinion, if Local 1422 allows the new applicants to shape up in the current hiring facility along with the members already in the workforce, it will be one of the most irresponsible things we could ever do.  It would be a willful violation of the fire safety standards and we would have exceeded the capacity of the building hundreds of times over.  It would be very unsafe and Local 14222 would be putting at risk its insurance coverage and the assets of the organization.

Id.  Riley concluded by requesting a meeting with Daggett to discuss these issues.  Id.

In June 2019, Daggett and Riley had a face-to-face meeting along with the other

ILA Executive Officers.  See ECF No. 103-7 at 1.  Daggett then sent Riley a letter on

June 13, 2019, in which Daggett summarized Riley's concerns about the lack of parking

at the hiring hall:

> Meanwhile, the increased number of members trying to make themselves
> available for employment has created unsafe overcrowding in the hiring
> hall, sometimes resulting in injuries.  In particular, women members have
> complained that they are unable to participate in the referral process because
> they uncomfortable [sic] with being shoved and jostled, and they feel
> unsafe.  Likewise, there is also a fire safety issue as more people than the
> building was designed to accommodate are forced to crowd into the space,
> and there are ongoing traffic issues related to the lack of parking spaces.

ECF No. 103-7 at 2.  Daggett concluded the letter by explaining that Local 1422's bylaws

do not require a membership vote for approval of purchasing a new building and thus

overruled Local 1422's membership vote blocking the sale of their building.  Id. at 3.  He

then directed Riley to hold a meeting of Local 1422's Trustee Board to consider

proposals for acquiring a new building.  Id. at 3.

Evidently, one of the Local 1422 members then appealed the decision overruling

the members' vote by filing a complaint with the ILA's Grievance Committee.  See ECF

No. 103-8 at 4; see also Riley Depo. at 105:19–106:2.  The ILA Grievance Committee

affirmed the decision to block Local 1422's members' vote, "but in light of various

misunderstandings" the ILA Grievance Committee recommend that Daggett "appoint a

committee to assist Local 1422 in addressing its need to develop a plan to supply labor

including but not limited to the sale of the current building, the purchase of a new

building or property or any type of lease/buyback arrangement."  ECF No. 103-8 at 5–6.

Consequently, on July 29, 2019, Daggett appointed ILA Vice-President Raymond Sierra

("Sierra") and ILA Vice-President Virgil Maldonado ("Maldonado") to serve as a committee to assist Local 1422 with purchasing a new building. ECF No. 103-9 at 1.

In August 2019, Sierra and Maldonado traveled to Charleston to investigate Local 1422's inability to provide labor, its financial operations, and the sale of its building. ECF No. 103-10 at 2. Ultimately, Sierra and Maldonado concluded "that the issues that are plaguing Local 1422 go well beyond its search for more suitable location that can meet the Port of Charleston's growing labor needs." Id. at 3. Sierra explained in an August 13, 2019 letter to Daggett that significant political infighting among Local 1422's leadership was hindering Local 1422's ability "to assure the performance of collective bargaining agreements; to assure the performance of the duties of a collective bargaining representative; and to otherwise carry out the objects and purposes of the I.L.A." Id. More specifically, Sierra found that Local 1422 had been unable to meet its obligations to employers, hire and train new longshoremen, or "resolve its need for a larger hiring hall with more parking space." Id. Consequently, Sierra concluded by recommending that Daggett impose an emergency trusteeship "to address the many issues that are now plaguing Local 1422." Id. According to Sierra, "[i]f these issues [were] not urgently corrected, the future viability of Local 1422 and the jurisdiction of the ILA in the Port of Charleston w[ould] be seriously compromised." Id.

In relevant part, the ILA constitution states that the ILA's president has the power "to suspend the officers of a local union . . . and to appoint a trustee or trustees to take charge and control of the books, records, property, assets funds and affairs of such subordinate body." ECF No. 103-4, ILA const. art. XXI, § 2. The ILA constitution goes on to direct that:

> All trustees shall be appointed in writing setting forth their powers and duties. The trustee shall promptly assume his duties as such trustee. The officers under charges or investigation, as the case may be, shall cooperate fully with the trustee in the discharge of his duties. <u>The trustee shall act under the supervision of and shall report to the International President. A trustee, however appointed, may be replaced by the International President.</u> The trustee shall take all steps necessary and proper to carry out the purposes of the trusteeship. He shall continue to act as such trustee until the trusteeship shall be terminated by the provisions of the decision of the Executive Council on the charges before it.

ILA const., art. XXI, § 4 (emphasis added).

Based on Sierra's recommendation, Daggett appointed Maldonado trustee of Local 1422 on August 14, 2019. ECF No. 103-1. That day, Daggett sent a series of letters to formalize Maldonado's control. See id.; ECF Nos. 103-11; 103-12.

First, Daggett sent a letter to Maldonado stating:

> I direct you to immediately take control of the affairs of Local 1422. As Trustee you have the authority to retain or bring back any local officers that you believe can assist you in carrying out your duties. In addition, you are directed to keep the office of ILA Ethical Practices Counsel Hon. Joel A. Pisano appraised of any issues that arise within his jurisdiction.

> All local assets, including real property, whether held in trust or by a non-profit or similar entity, shall be subject to your control. All books and records of ILA Local 1422 shall be turned over to you. No money shall be drawn from the account of ILA Local 1422 except you're your [sic] approval.

> Local 1422 and the officers and members thereof are hereby directed to cooperate fully with you, in order that the purpose of the trusteeship may be fulfilled and the autonomy of ILA Local 1422 restored as soon as possible.

ECF No. 103-1.

Second, Daggett sent a letter to Local 1422's officers informing them of Maldonado's appointment as trustee. ECF No. 103-11. In this letter, Daggett relieved the officers of their duties and ordered that they cooperate with Maldonado:

> During the period of trusteeship all officers, officials and others operating under purported authority of ILA Local 1422 are hereby relieved of their

7

> respective duties.  All books and records of ILA Local 1422 shall be turned over to Vice-President Maldonado.  No money shall be drawn from the account of ILA Local 1422 except upon the approval of Vice-President Maldonado.  All local assets, including real property, whether held in trust of by a non-profit or similar entity, shall be subject to Vice-President Maldonado's control.

ECF No. 103-11 at 1.

Third, Daggett sent a letter facilitating Maldonado's control over Local 1422's finances by requesting that the bank remove the signatures of Local 1422's officers from the bank's signature card and replace them with Maldonado's signature.  ECF No. 103-12.

Upon assuming the trusteeship, Maldonado sent a series of letters to the port employers informing them that he had taken control as trustee of Local 1422 and directing that they deal directly with him when discussing Local 1422's contracts.  ECF Nos. 103-13; 103-14; 103-15; 103-16; 103-17.  As trustee, Maldonado approved the issuance of approximately 2,200 work cards to meet Local 1422's labor obligations in July 2020.  See ECF No. 103-2, Maldonado Depo. at 119:5–121:23.  In doing so, this increased the number of workers at the hiring hall, but Local 1422 did not do anything to increase the space at the hiring hall to accommodate these additional workers.  Id. at 121:20–23, 128:1–129:2.

### C.  The Pyatts' Allegations Related to the Accident[3]

The Pyatts allege that, during the early morning hours of September 24, 2020, Mr. Pyatt was on his way to Local 1422's hiring hall to receive a daily work assignment but

---

[3] The specific facts of the accident are largely irrelevant to the court's analysis of whether the ILA can be held liable under an agency theory.  Consequently, the court recites the Pyatts' allegations in this section for background purposes and will examine whether the Pyatts have evidence to support their negligence and loss of consortium claims in a future order.

that, when he arrived, there were no available parking spaces.  Amend. Compl. ¶¶ 32–33.

As a result, he was forced to park across the street, and as he walked across the road from

where he parked to the hiring hall, he was struck and severely injured by a truck driven

by defendant Otis Whaley ("Whaley"), who was employed by Charleston Stevedoring

Company ("CSC").  Id. ¶¶ 33–49.  In general, the Pyatts assert that the accident was

caused because of overcrowded and unsafe parking conditions at the hiring hall and that

Local 1422 was aware of, or possibly caused, these unsafe conditions and did not

adequately address the situation.  Id. ¶¶ 19–22, 29.

### D. Procedural History

On January 10, 2023, the Pyatts filed this lawsuit in the Charleston County Court

of Common Pleas against Local 1422, Whaley, and CSC.  Pyatt v. Int'l Longshoremen's

Ass'n Loc. 1422, No. 2023-CP-10-00154 (Charleston Cnty. Ct. C.P. filed Jan. 10, 2023).

The Pyatts initially asserted claims for negligence and loss of consortium against all three

of these defendants.[4]  See Compl., ECF No. 1-1.  After filing their initial complaint, the

Pyatts became aware that the ILA had imposed the emergency trusteeship at the time of

the accident.  See ECF No. 8 at 3; Amend. Compl. ¶¶ 16–17.  Consequently, the Pyatts

amended their complaint to add the ILA as a defendant on September 21, 2023.  See

Amend. Compl.  The ILA then removed the case to this court on November 13, 2023.[5]

ECF No. 1.

---

[4] All parties have since stipulated to the dismissal of the Pyatts' claims against
CSC on February 18, 2025, and CSC is therefore no longer a party to this case.  See ECF
Nos. 89; 90.

[5] As the court explained in a prior order, when the court must resort to interpreting
labor union constitutions to determine whether a duty existed to support a state-law tort
claim, the tort claim is considered preempted by federal law, and removal to the federal
court is proper.  See Wooddell v. Int'l Bhd. of Elec. Workers, Loc. 71, 502 U.S. 93, 98–

There are several motions currently pending in this case.  Most of these relate to the Pyatts' state-law claims stemming from the accident itself and the various discovery issues emanating from those claims.[6]  However, on March 21, 2025, the ILA moved for summary judgment, and unlike the other motions, the ILA's motion focuses exclusively on the issue of whether federal labor law prevents the ILA from being held liable for Local 1422's allegedly tortious conduct.  ECF No. 94.  Electing to resolve this issue first, the court directed the parties to brief the issue and stated that it would reserve the other pending motions for future rulings.  See ECF No. 99.  The Pyatts then responded in opposition to the ILA's motion for summary judgment on April 4, 2025, ECF No. 103, to which the ILA replied on April 11, 2025, ECF No. 105.  The court held a hearing on this issue on April 16, 2025.  ECF No. 106.  As such, the ILA's motion for summary judgment is fully briefed and now ripe for the court's review.

## II.  STANDARD

Summary judgment shall be granted if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  "By its very terms, this standard provides that the mere existence of some

---

103 (1991); Chappell v. Int'l Bhd. Elec. Workers Loc. Union 722, 120 F. Supp. 3d 492, 497–98 (D.S.C. 2015), aff'd 645 F. App'x 265 (4th Cir. 2016).

[6] In particular, the Pyatts settled with Whaley and moved to dismiss the claims they assert against him on November 20, 2024.  ECF No. 63.  However, the other defendants oppose dismissal of the claims against Whaley, see ECF No. 65, and the Pyatts' motion to dismiss those claims remains pending.  Additionally, Local 1422 moved for summary judgment on January 2, 2025, arguing that the Pyatts cannot sustain their negligence claim for a variety of reasons, and this motion also remains pending.  ECF No. 69.  Finally, the Pyatts also filed two motions to compel discovery responses from Local 1422 that remain pending.  ECF Nos. 86; 92.

alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Id. at 248. "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. In so doing, the court must view the evidence in the light most favorable to the non-moving party and draw all inferences in its favor. Id. at 255.

### III.   DISCUSSION

Federal labor law treats international unions and their local affiliates as separate entities. United Elec., Radio & Mach. Workers of Am. (UE) v. N.L.R.B., 986 F.2d 70, 75 (4th Cir. 1993). Consequently, an international union is not automatically liable for the actions of a local affiliate; instead, an international will generally only be liable for a local's tortious conduct if there is a common law agency relationship between the two entities. See Carbon Fuel Co. v. United Mine Workers of Am., 444 U.S. 212, 217–18 (1979); Coronado Coal Co. v. Mine Workers, 268 U.S. 295, 304 (1925); Alexander v. Loc. 496, Laborers' Int'l Union of N. Am., 177 F.3d 394, 409 (6th Cir. 1999); Berger v. Iron Workers Reinforced Rodmen Loc. 201, 843 F.2d 1395, 1430 (D.C. Cir. 1988) ("The implication of the Supreme Court's decisions in Carbon Fuel and Coronado Coal . . . is

11

instructive: in the absence of an explicit congressional directive to the contrary, common-law agency principles govern an international's liability for the unlawful actions of its locals."), reh'g granted on other grounds, 852 F.2d 619 (D.C. Cir. 1988).

Under the Labor-Management Reporting and Disclosure Act of 1959 § 302, 29 U.S.C. § 462, an international union may impose a trusteeship over a local affiliate when doing so is permitted by the international union's constitution and bylaws "for the purpose of correcting corruption or financial malpractice, assuring the performance of collective bargaining agreements or other duties of a bargaining representative, restoring democratic procedures, or otherwise carrying out the legitimate objects of such labor organization."  In general, the parties' disagreement comes down to whether, or to what extent, the ILA's imposition of the trusteeship over Local 1422 impacts the agency analysis.

## A. The Parties' Arguments

The ILA starts with the premise that, under federal law, a trustee owes a fiduciary duty to the local union rather than to the international union.  ECF Nos. 94-1 at 9; 105 at 2–5.  From this, the ILA argues that the trusteeship alone cannot establish an agency relationship between itself and Local 1422.  ECF No. 94-1 at 9–12.  The ILA then argues that there is no evidence outside of the trusteeship that indicates an agency relationship in this case.  Id. at 12–16.  The ILA contends that an agency relationship can only be shown by "actual control [by a parent union] over its local affiliate, not its theoretical control."  Id. at 13.  It points to the letter Daggett sent Maldonado directing him to put Local 1422 under Maldonado's control, which the ILA argues shows that Local 1422 was not under the ILA's control.  Id. at 15.  Finally, the ILA points to various places in Maldonado's

deposition in which Maldonado testified that he took control of Local 1422 as trustee and designated others to run the operations of Local 1422, such as hiring decisions, which the ILA contends is consistent with how trustees are supposed to run the local unions.  Id. at 15–16 (citing ECF No. 94-7 at 92:6–7, 95:23–25).

In response, the Pyatts first argue that the ILA exercised complete control over Local 1422 and the hiring hall.  ECF No. 103 at 14–16.  In support of this argument, the Pyatts mostly point to the various letters from Daggett appointing Maldonado as trustee of Local 1422 and authorizing him to take various actions to further his duties as trustee. Id. at 15 (citing ECF Nos. 103-1; 103-11; 103-12; 103-19).  The Pyatts then point to Maldonado's testimony that he took complete control of Local 1422.  Id. (citing Maldonado Depo. at 88:22–25, 90:22–93:4).  The Pyatts similarly underscore various letters Maldonado sent to the port-area employers stating that Local 1422 no longer had an ability to negotiate contracts on its own.  Id. at 16 (citing ECF Nos. 103-13; 103-14; 103-15; 103-16; 103-17).  They also note that Maldonado issued approximately 2,200 work cards to new ILA members, "which he knew would aggravate the problems with overcrowding, inadequate parking, and member safety by increasing the number of workers arriving at the Hiring Hall each day."  Id.  The Pyatts also argue that the ILA's constitution gives the ILA president authority to supervise the trustee.  Id. (citing ILA const., art. XXI, § 4).  From this, the Pyatts contend that the jury could find that the ILA retained control over all of Local 1422's business affairs.  Id.  The Pyatts further assert that the ILA constitution shows that Daggett had a right to control Maldonado, making Maldonado an agent of the ILA who committed torts within the course and scope of the agency.  Id. at 17–19.

In reply, the ILA first contends that the hiring hall was controlled by Riley, who exercised authority conferred on him by trustee Maldonado.  ECF No. 105 at 3–4 (citing ECF No. 105-1).  Therefore, the ILA argues that decisions regarding the hiring hall were made entirely by those working for Local 1422 rather than the ILA and that the ILA never undertook a duty to fix Local 1422's parking situation.  Id.  The ILA then asserts that the Pyatts have not put forth any evidence showing an agency relationship and have misstated the law governing international unions.  Id. at 5–10.  While the ILA does not dispute that Maldonado took control over Local 1422 as trustee, it argues that this fact cannot be used to show that the ILA, itself, took control over Local 1422.  Id. at 5.  The ILA then argues that Maldonado is not its agent.  Id. at 7.  It notes that, under the ILA constitution, the vice president is democratically elected and that the ILA cannot fire him at will.  Id.  The ILA reiterates that union interpretations of its contracts are afforded deference.  Id.  The ILA then points out that it did not compensate Maldonado for his role as trustee.  Id. at 8 & n.2.  The ILA further reiterates its position that there cannot be vicarious liability between itself and Local 1422 because the Pyatts have not produced evidence of "active instigation, support, or ratification" of any of Local 1422's actions by the ILA.  Id. at 8, 10.

### B.  The Court's Analysis

#### 1.  Choice of Law

Before directly addressing whether the ILA can be vicariously liable, the court must first address a preliminary choice of law issue.   To reiterate, both parties appear to agree that the court must be guided by common law agency theories.  See ECF Nos. 94-1; 103; accord Alexander, 177 F.3d at 409.  Yet, while the ILA asserts that the possibility of

14

an agency relationship between an international and local union is governed by federal common law, ECF No. 105 at 6, the Pyatts argue that this question is governed by South Carolina common law, ECF No. 103 at 17 n.6. Nevertheless, the Pyatts concede that this distinction is "mostly academic, as the foundational principles of agency law are uniform across the country, including the relevant principles of federal common law." ECF No. 103 at 17 n.6.

As the court explained in a prior order, the reason this case is in federal court is because the Pyatt's state-law claims are preempted by federal labor law under § 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185(a). ECF No. 25 at 3 n.2. Courts have interpreted § 301 as preempting state-law claims that require interpretation of a collective bargaining agreement, and the Supreme Court has extended that preemption to cases concerning interpretations of union constitutions. See Wooddell v. Int'l Bhd. of Elec. Workers, Loc. 71, 502 U.S. 93, 98–103 (1991); Chappell v. Int'l Bhd. Elec Workers Loc. Union 722, 120 F. Supp. 3d 492, 497–98 (D.S.C. 2015), aff'd 645 F. App'x 265 (4th Cir. 2016). "Section 301 not only provides federal courts with jurisdiction over employment disputes covered by collective bargaining agreements, but also directs federal courts to fashion a body of federal common law to resolve such disputes." McCormick v. AT&T Techs., Inc., 934 F.2d 531, 534 (4th Cir. 1991). Because this case involves interpretation of the ILA's constitution, the court finds that the agency determination is governed by federal common law.

### 2. Agency

Having determined that the agency question is governed by federal common law, the court is now tasked with determining what that law is and how it applies to this case.

Unfortunately, the federal courts have, thus far, provided much less guidance on this issue than the ILA's briefing might suggest. While the ILA asserts that "[c]ourts have unanimously rejected the notion of using the existence of a trusteeship to render an international union liable for the acts or omissions of a local union under a vicarious liability theory," ECF No. 94-1 at 10, none of the cases it cites for this proposition concern common law tort liability, see Campbell v. Int'l Bhd. of Teamsters, 69 F. Supp. 2d 380 (E.D.N.Y. 1999) (examining whether an international's trusteeship rendered the international liable for the local's potential employment discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000, et seq.); U.S. E.E.O.C. v. Ceres Terminals, Inc., 2001 WL 109811 (N.D. Ill. Feb. 5, 2001) (examining whether the ILA's trusteeship made the ILA potentially liable for a local union entering into a collective bargaining agreement that allegedly violated the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621, et seq.); Burnick v. Off. & Pro. Emps. Int'l Union, 2015 WL 1898310, (E.D. Wis. April 27, 2015) (examining whether an international union's trusteeship could make the international union liable for the local union's suspension of health insurance benefits under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, et seq.). Indeed, this court is unaware of any cases in which another court has examined whether the imposition of a trusteeship could make an international union liable for a common law tort allegedly committed by a local union. That said, this court turns first to the District Court for the Eastern District of New York's decision in Campbell, 69 F. Supp. 2d 380 and the District Court for the Northern District of Illinois's decision in Ceres Terminals, 2001 WL 109811—two of the decisions heavily relied upon by the ILA in this case. See ECF No. 94-1 at 9–11.

16

In <u>Campbell</u>, a local union employee brought a Title VII claim against both the local union and the international union based on racial employment discrimination. 69 F. Supp. 2d 380. At the time of the alleged discrimination, the local union was under the control of a trustee who had been appointed by the international union. <u>Id.</u> at 382. The plaintiff alleged that the international could be held liable because both the trustee and the local were the international union's agents. <u>Id.</u> at 386. The court explained that, because the trustee owed fiduciary duties to the local union, rather than the international union under federal labor law and because the international's constitution stated that the trustee must act solely in the interest of the local union, the trustee could not be considered the international's agent. <u>Id.</u> Consequently, the court determined that the plaintiff had not alleged any basis for imposing liability on the international because there was no basis for an agency relationship. <u>Id.</u>

Similarly, in <u>Ceres Terminals</u>, the Equal Employment Opportunity Commission ("EEOC") brought an action against the ILA for age discrimination in connection with a collective bargaining agreement between the ILA's local union and Ceres Terminals, Inc. ("Ceres"). 2001 WL 109811, at *1–2. Prior to the events giving rise to the lawsuit, the ILA had removed the officers of the local union and had imposed a trusteeship, and it was this trustee who had signed the agreement with Ceres on behalf of the local union. <u>Id.</u> Thus, the EEOC argued that the ILA could be liable under an agency theory because the trustee "was appointed by, reported to, and was under the supervision of the president of the ILA." <u>Id.</u> at *7. Citing <u>Campbell</u>, the court found that the trusteeship did not create an agency relationship because the trustees owe a fiduciary duty to the local, rather than the international. <u>Id.</u> at *8 (citing <u>Campbell</u>, 69 F. Supp. 2d at 386). The court

17

further explained that the EEOC had not presented evidence showing that the ILA "had the right to control [the trustee's] conduct and that [the trustee] had to the [sic] power to affect the legal relations of the ILA." Id. The court noted that Article XXIII, Section 17 of the ILA constitution specifically states that there is not an agency relationship between the ILA and officers of local unions and that local union officials did not have the power to bind the ILA to any contractual agreement.[7] Ceres Terminals, 2001 WL 109811, at *8.

---

[7] Article XXIII, Section 17 of the ILA constitution provides that:

> No local union or any officer or agent thereof shall have the power to make any contract binding upon or incur any liability on behalf of the I.L.A. without the written authority of the Executive Council. The I.L.A. shall not be liable under any contract, or for any acts or conduct of a local union or a district council or a district organization, or their officers or agents unless such contracts, acts, or conduct have been duly authorized by the I.L.A. No officer, representative, or organizer of a local union or any subdivision of the I.L.A. shall be, or be deemed to be, an agent of the I.L.A. and to the extent that their acts or conduct are acts of agency under the law of agency, they shall be agents only of such local union or such subdivision. Nothing in this Section shall be construed to mean that officers, representatives and organizers of a local union may not also hold office in a district council, a district organization, or the International.

ILA const. art. XXIII, § 17.

The ILA argues that, in the years since the court decided Ceres Terminals, this section of the ILA's constitution has remained unchanged and is applicable in this case. ECF No. 94-1 at 11. Thus, the ILA contends that, pursuant to this Section, "an appointed trustee, shall not act under the auspices of the ILA and shall, instead, serve on behalf of the local union or subdivision." Id. However, that is not how the court in Ceres Terminals interpreted this provision. See 2001 WL 109811, at *8. Rather, the court explained that this Section indicates that the trustee did not have authority to enter into a contract on behalf of the ILA. Id. Yet, unlike in Ceres Terminals, the case at bar does not involve a trustee purportedly entering into a contract on behalf of the ILA, making the court's discussion of this Section from Ceres Terminals largely inapposite.

Beyond that, the existence of an agency relationship "does not depend upon the intent of the parties to create it, nor their belief that they have done so." Restatement (Second) of Agency § 1 cmt. b. Relatedly, it is for the court, rather than the parties, "to ascertain the factual relation of the parties to each other and in so doing can properly disregard . . . a statement by the parties as to the legal relations which are thereby created." Id. Thus, even to the extent this Section states that there was no agency

Consequently, the court granted summary judgment in the ILA's favor for these reasons.
Id.

This court is convinced from the deep analysis of these decisions that a trusteeship alone is insufficient to establish an agency relationship and thus impose liability on an international union for a local union's unlawful conduct.  See Campbell, 69 F. Supp. 2d at 386; Ceres Terminals, 2001 WL 109811, at *8.  However, that does not mean a trusteeship is irrelevant to the agency analysis.[8]  Thus, the court now turns to federal common law principals to determine how the trusteeship fits into the agency analysis.  In so doing, the court observes that many courts—including the court in Campbell—have deferred to the Restatements of Agency to help determine what the federal common law is that applies in these situations.  See Campbell, 69 F. Supp. 2d at 386 (citing Restatement (Second) of Agency §§ 219–237 (1958)); see also, e.g., Berger, 843 F.2d at 1430 (citing Restatement (Second) of Agency § 212 (1958)); Burnick, 2015 WL 1898310, at *3 n.5 (citing Restatement (Third) of Agency § 2.02 (2006)).  This court will do the same.

According to the Restatements, a principal is liable for the torts committed by the agent within the scope of the agency.  Restatement (Second) of Agency § 219; see also

---

relationship, the court finds that other facts could suggest the existence of such a relationship, as described below.

[8] In addition to the fact-specific analysis provided in both Campbell, 69 F. Supp. 2d at 385–86, and Ceres Terminals, 2001 WL 109811, at *8, the Ninth Circuit has also implied that the imposition of a trusteeship could be a "circumstance[] that would support an inference of agency," Laughon v. Int'l All. of Theatrical Stage Emps., 248 F.3d 931, 935 (9th Cir. 2001).  While the court ultimately found that an agency relationship between an international union and a local union did not exist in Laughon, it made this determination, in part, because the international union had not assumed a trusteeship over the local union prior to the events relevant to the dispute.  248 F.3d at 935.

id. § 243 ("A master is subject to liability for physical harm caused by the negligent conduct of servants within the scope of employment.").  In general, the Restatements define agency as "the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." Id. § 1(1).  Thus, to the ILA's point, a fiduciary relationship between the agent and principal is an essential characteristic of an agency relationship, see id. §§ 1(1); 13, and the fact that the trustee generally owes a fiduciary duty to the local union rather than the international weighs in favor of finding no agency relationship in this case, see id.; Campbell, 69 F. Supp. 2d at 386.

On the other hand, while the ILA argues that the federal common law requires evidence of "a parent labor organization's actual control over its local affiliate, not its theoretical control," ECF No. 94-1 at 13, the Restatements are clear that a principal's "right to control the conduct of the agent with respect to matters entrusted to him" is another essential characteristic of the agency relationship, Restatement (Second) of Agency § 14 (emphasis added).  Indeed, whether a servant's conduct is within another's "control or right to control" is an important, and in many cases dispositive, factor in determining the existence of an agency relationship.  See Restatement (Second) of Agency § 220(1) & cmt. d.  This approach is also supported by the court's reasoning in Ceres Terminals, 2001 WL 109811, at *3.  Though the court in that case ultimately found that the ILA could not be liable for the conduct of the trustee, the court recognized that the ILA's "right to control [the trustee's] conduct" was an important aspect of the court's analysis of whether an agency relationship existed.  See 2001 WL 109811, at *3.

Additionally, in <u>Burnick</u>, 2015 WL 1898310, at *3, the District Court for the

Eastern District of Wisconsin ruled that a trustee was an agent of an international union

because, under the international's constitution, the trustee was answerable to and may be

replaced by the international's president.  Even so, the court went on to explain that "the

trustee is not an agent of [the international] for all purposes, only for purposes of

managing the business of [the local].  In other words, the scope of the trustee's authority

is limited to managing the business of [the local] during the trusteeship."[9]   <u>Burnick</u>,

2015 WL 1898310, at *3 n.5.

Based on the Restatements, the court's reasoning in <u>Ceres Terminals</u>, and the

court's reasoning in <u>Burnick</u>, this court concludes that an international union's "right to

control" (as opposed to merely its actual control) is an important consideration in

determining the existence of an agency relationship.[10]   <u>See</u> Restatement (Second) of

---

[9] Despite finding that the trustee was the international's agent, the court ultimately determined that the international could not be liable because the local's alleged liability arose based on obligations in a collective bargaining agreement the local entered into before the trusteeship was established and the international never assumed an independent obligation.  <u>See</u> <u>Burnick</u>, 2015 WL 1898310, at *3.

The court noted, citing <u>Ceres Terminals</u>, that the trustee would not have authority to enter into a contract on behalf of the international union rather than the local union because such a transaction would be outside of the scope the trustee's management of the local.  <u>See</u> <u>Burnick</u>, 2015 WL 1898310, at *3 n.5 (citing <u>Ceres Terminals</u>, 2001 WL 109811, at *8).  This distinction is not relevant to this case because a reasonable jury could find that Maldonado's allegedly tortious conduct was related to his managing Local 1422, as explained further below.

[10] To the extent the <u>Burnick</u> court's analysis is inconsistent with the <u>Campbell</u> court's analysis on this point, this court finds that the <u>Burnick</u> court's reasoning is more consistent with the common law principals articulated in the Restatements and, thus, more persuasive.  <u>See</u> Restatement (Second) of Agency §§ 14, 220(1) & cmt.d.

Additionally, it is true, as the ILA argues, that some courts have required "active instigation, support, or ratification" of a local's activities for an international to be vicariously liable.  ECF No. 105 at 8; <u>accord, e.g.,</u> <u>Moore v. Loc. Union 569 of Int'l Bhd. of Elec. Workers</u>, 989 F.2d 1534, 1543 (9th Cir. 1993), <u>as amended</u> (June 28, 1993).  However, this is just one theory of agency, and other courts have found an agency

Agency §§ 1(1), 14, 220(1) & cmt. d.; <u>Ceres Terminals</u>, 2001 WL 109811, at *3; <u>Burnick</u>, 2015 WL 1898310, at *3.

Turning to the evidence presented in this case, much like in <u>Burnick</u>, the ILA's constitution directly states that the ILA president has the authority to supervise the trustee and has the power to remove him: "[t]he trustee shall act under the supervision of and shall report to the International President[, and a] trustee, however appointed, may be replaced by the International President." ILA const., art. XXI, § 4; <u>accord</u> Maldonado Depo. at 35:11–15 (acknowledging that the ILA constitution gives the president authority to supervise him as trustee). A reasonable jury could find, from this clear and unambiguous language,[11] that the ILA had a right to control Maldonado.

Beyond that, when Sierra initially recommended that Daggett appoint a trustee, he cited the various issues that were apparently hindering Local 1422's ability "to otherwise carry out the objects and purposes of the I.L.A." ECF No. 103-10 at 3. Sierra also warned that the trusteeship was necessary because, if these issues were not "urgently corrected . . . the jurisdiction of the ILA in the Port of Charleston [would] be seriously compromised." <u>Id.</u> A reasonable jury could interpret this statement as suggesting that Daggett appointed Maldonado as trustee, at least in part, specifically to benefit the ILA, and this factor similarly points to the existence of an agency relationship. <u>See</u> Restatement (Second) of Agency § 1(1). Consequently, viewing the facts of this case

---

relationship in the union context based on a control-based theory of agency. <u>See</u> <u>Samson Tug & Barge Co. v. Int'l Longshore & Warehouse Union</u>, 2023 WL 2265677, at *5 (D. Alaska Feb. 28, 2023) (citing <u>Laughon</u>, 248 F.3d at 935).

[11] Even to the extent courts defer to a union's interpretation of its constitution, unions do not have the authority to ignore clear and unambiguous language. <u>Nichols v. Dole</u>, 1990 WL 272704, at *3 & n.8 (D.S.C. Aug. 1, 1990).

most favorably to the Pyatts, a reasonable jury could find that Maldonado was the ILA's agent.

Of course, this conclusion does not end the court's inquiry. Even if a jury could find that Maldonado, as trustee, acted as an agent of the ILA, the ILA would only be liable for actions taken by Maldonado within the scope of that agency, meaning actions taken by Maldonado in managing the business of Local 1422 during the trusteeship. See Burnick, 2015 WL 1898310, at *3 n.5.

Maldonado testified that, in July 2020, Local 1422 issued approximately 2,200 work cards, so that Local 1422 could increase the number of available workers to meet its labor obligations. Maldonado Depo. at 121:4–19. While Maldonado could not specifically recall who made the decision to issue these new cards, he conceded that, as trustee, the cards could not have been issued without his approval. Id. at 121:8–14. He also conceded that this decision led to more individuals showing up at the hiring hall to receive work assignments and that Local 1422 did not make any changes at the hiring hall to accommodate this new influx. Id. at 121:20–23, 128:1–129:2. Not only was Local 1422's inability to meet its labor demands part of the reason Daggett appointed Maldonado as trustee in the first place, see ECF No. 103-10 at 3, a reasonable jury could certainly find that Maldonado's approval of the new work cards was a decision made by him as trustee related to managing the business of Local 1422, see Burnick, 2015 WL 1898310, at *3 n.5. Beyond that, a reasonable jury could also find that this decision led to Mr. Pyatt's accident.[12] See Maldonado Depo. at 121:20–23, 128:1–129:2; Riley Depo.

_____

[12] To reiterate, the court's finding in this order is limited to whether the ILA could be liable under a vicarious liability theory. The court makes no finding at this time on whether any decision made by Maldonado or Local 1422 was a proximate cause of Mr.

at 36:4–10 (acknowledging that Mr. Pyatt was injured during the trusteeship after the issuance of the new work cards); ECF No. 103-20, Mr. Pyatt Depo. at 99:6–11, 114:20–116:21 (explaining that he parked across the street because other cars were already parked in Local 1422's parking lot and that he was struck by Whaley while crossing back across the street).

In sum, making all reasonable inferences in the Pyatts' favor, a reasonable jury could find that Maldonado was the ILA's agent when he acted as trustee and that his decision to approve new work cards was within the scope of that agency. Thus, to the extent this decision was a proximate cause of the Pyatts' injuries, whether the ILA could be vicariously liable for Maldonado's allegedly tortious conduct as trustee of Local 1422 is a genuine issue of material fact.

## IV.   CONCLUSION

For the reasons set forth above, the court **DENIES** the ILA's motion for summary judgment.

**AND IT IS SO ORDERED.**

**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**June 2, 2025**
**Charleston, South Carolina**

---

Pyatt's injuries and instead reserves such a decision for a future order on Local 1422's pending motion for summary judgment. See ECF No. 69.